IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

BARBARA S. SHEESLEY,
     Plaintiff,

v.                                                        No: 5:07cv122/RS/MD

MICHAEL J. ASTRUE,
Commissioner of Social Security,
     Defendant.
_____

## REPORT AND RECOMMENDATION

     This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Sheesley's application for disability insurance benefits under Title II of the Act.

     Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded.

## PROCEDURAL HISTORY

     Plaintiff filed an application for disability insurance benefits on November 15, 1998.  The claim was denied on March 29, 2001 by an Administrative Law Judge (ALJ) after a hearing, and that decision was not appealed.  Therefore, as a matter of

law, the March 29, 2001 decision has res judicata effect and plaintiff was not disabled as of that date.

On April 26, 2001, plaintiff filed another application for disability insurance benefits claiming an onset date of November 15, 1998. This second claim was denied initially and on reconsideration and plaintiff requested a hearing before an ALJ. A hearing was held on May 7, 2003 at which plaintiff was represented by counsel and testified. A vocational expert also testified. At the hearing, plaintiff amended her claimed onset date to March 3, 2001. The ALJ entered an unfavorable decision and plaintiff appealed. On October 8, 2004 the Appeals Council remanded the case for further consideration, and a second hearing was held on July 28, 2005. Plaintiff was represented by counsel and testified at the second hearing. Also testifying were a vocational expert and a medical expert.

In the meantime, plaintiff had filed a third application on April 18, 2003 while the first application was on appeal and the second application was still pending. The third application was denied initially and on reconsideration, and the ALJ consolidated the second and third applications. After the July 28, 2005 hearing the ALJ rendered an unfavorable decision (tr. 24-38), and the Appeals Council declined review, making the July 28, 2005 decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court. *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998). This appeal followed.

## FINDINGS OF THE ALJ

Relative to the issues raised in this appeal, the ALJ found that plaintiff had severe conditions of (1) degenerative disc disease, status post-lumbar disc surgery, (2) chondromalacia of the left knee, (3) fibromyalgia, and (4) carpal tunnel syndrome, but that she did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed on Appendix 1, Subpart P,

Regulations No. 4; that her allegations concerning her limitations were not totally credible; that she had the residual functional capacity for light work; that she was unable to perform her past relevant work; that she was a younger individual with a high school education but no transferrable skills; that she had the residual functional capacity to perform a significant range of sedentary and light work; that although she could not perform the full range of light work, there were a significant number of jobs in the national economy that she could perform; and that she was not disabled as defined in the Act.

## STANDARD OF REVIEW

The ALJ's decision will be reversed only if it is not supported by substantial evidence. *Falge, supra*. The court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles." *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). Findings of fact by the Commissioner that are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps. A finding of disability or no disability at any step renders further evaluation unnecessary. The steps are:

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairment?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4. Does the individual have any impairments which prevent past relevant work?

5. Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. *Chester v. Bowen*, supra, 792 F.2d at 131; *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, claimant must prove that she cannot perform the work suggested by the Commissioner. *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987).

## PLAINTIFF'S MEDICAL HISTORY

As noted above, plaintiff is deemed as a matter of law to have been able to work as of March 29, 2001. Consequently, her medical history prior to that time will not be discussed in detail. By way of background, however, the record shows that in January 1999 plaintiff underwent a bilateral laminectomy at L3-4 with bilateral discectomy (tr. 279). She was followed by her surgeon, Dr. Johns, by a rheumatologist, Dr. LaCour, and by Robert Joseph, M.D., a pain specialist. Dr. Joseph and Dr. LaCour have been plaintiff's primary treating physicians ever since. As of the res judicata date, plaintiff still complained of chronic low back pain, chronic thoracic pain, chronic neck problems, and headaches (tr. 335). She also had problems with her knees, and on March 21, 2001 (eight days before the res judicata date) she was referred to Michael Rohan, M.D., an orthopedic surgeon. Dr. Rohan noted that plaintiff complained of knee pain beneath her kneecaps. On physical examination there was excellent range of motion, there was no instability or joint line tenderness of either knee and x-rays revealed no significant abnormalities. Dr. Rohan suggested knee straps, with braces if that were not successful. Plaintiff returned to Dr. Rohan on March 28, 2001 indicating that neither the straps nor the knee braces helped. Dr. Rohan indicated that an MRI of the knees would be a good idea but plaintiff first wanted to try a different knee brace (tr. 325). There is no indication that an MRI was done.

Plaintiff continued to see Dr. LaCour from June 19, 2001 through January 14, 2004. She complained variously of low back pain, neck pain, elbow pain, carpal tunnel syndrome and shoulder pain. An x-ray of her left knee taken on February 6, 2003 was read as normal (tr. 457). Shortly thereafter Dr. LaCour examined plaintiff's knee and did not note any abnormality (tr. 449). The last time Dr. LaCour saw the plaintiff, on January 14, 2004, she indicated that she was doing fair but still had pain

in her back, neck, mid-back, and left hip.  She did indicate she was benefitting from aquatic exercises, and on physical examination her gait was coordinated and smooth, no tender points were noted in her soft tissue and she had decreased range of motion and pain in her lower back.  Her medication was changed, she was prescribed a new lumbar support, and she was told to continue with her therapy and to return in one year (tr. 829-830).

On June 8, 2002, over 14 months after the res judicata date and two and one-half years after she last saw him, plaintiff returned to Dr. Joseph.[1]  She continued to complain of neck pain, mid thoracic pain and low back pain.  She had pain radiating into her hips, pain in both hands, her right knee and foot.  She claimed numbness in her legs which increased upon sitting.  She asked for nerve conduction studies and electromyograms on her legs which were ordered.  She was given a prescription for a wrist splint and was told to return in a month (tr. 426).  She returned four months later on November 18, 2002, essentially unchanged.  Her medication was refilled (tr. 425).

On April 20, 2003, Dr. Joseph filled out an assessment of pain form.  He indicated on the form that plaintiff's pain was effectively disabling, that her medication caused some side effects, but not serious ones, that she would be required to lie down for 15-30 minutes during an eight hour workday and that she could stand for an hour at a time or two hours in a workday.  He further opined that plaintiff could only occasionally lift up to five pounds and never lift 10 pounds or more, and that she could not use her hands repetitively for simple grasping, pushing or pulling because of her carpal tunnel syndrome (tr. 464-467).  On December 7, 2003 Dr. Joseph filled out another form in which he indicated that plaintiff's major problem was loss of motion in her cervical spine secondary to pain along with

---

[1] Dr. Joseph's record for that date indicates that plaintiff was in for a "four month follow up" but there is no record of her having seen him since January 28, 2000.

*Case No: 5:07cv122/RS/MD*

problems with her knee and muscle spasms in her back, but that there were no sensory, motor or reflex deficits in her extremities.  Her grip strength and fine dexterity were "O.K.," her gait and station were normal and she did not need an assistive device for ambulation (tr. 472).

On January 26, 2004, plaintiff returned to Dr. Joseph complaining of severe neck pain (tr. 539).  An MRI was done two days later, and the radiologist noted that there was slight straightening of the mid-cervical spine consistent with strain or spasm and minimal uncinate hypertrophy and foraminal narrowing to the right at C3-4 and to the left at C5-6 (tr. 538).  However,  Dr. Joseph looked at the same MRI and felt that it was essentially normal, "even more normal than the radiologist described."  Dr. Joseph thought that the physical examination was consistent with cervical facet dysfunction (tr. 537).  Plaintiff was given steroid injections in her neck (tr. 536) which she indicated were of no help (tr. 534-535).  Another cervical MRI was taken on March 29, 2004.  Plaintiff had been involved in a motor vehicle accident in the meantime.  This MRI was significant for osteophytes and a disc bulge complex and facet hypertrophy around C5-6 (tr. 819).  Plaintiff was given injections over the next several months (tr. 816-818) and on October 16, 2004 Dr. Joseph filled out a form for plaintiff's workers compensation insurer in which he indicated that plaintiff was totally disabled due to her ongoing problems with pain.  He further opined that she could only occasionally lift up to 20 pounds, could not reach above her shoulder, and could do simple grasping but no fine manipulation.  She was deficient in dexterity and power gripping with either hand, but was able to use her feet for repetitive movement for operating foot controls (tr. 823-824).

Plaintiff saw Dr. Joseph again on March 28, 2006 continuing to complain of constant low back pain.  She brought with her films from a recent lumbar MRI which showed hypertrophic osteoarthritic changes with degenerative disc disease at L3-4, L4-5, and L5-S1, with protrusion at L4-5 and at L5-S1 with a possible impingement

of the left S1 nerve root. There was also a hemangioma at L1. Dr. Joseph felt that an additional study of the sacrum was in order (tr. 813). A repeat MRI of the sacrum done two months later was read as showing that what appeared to be a cyst in the sacral region was a continuation of the thecal sack with some hourglass narrowing at the S1-S2 level and cysts on either side, probably representing a congenital variation with no clinical significance (tr. 812).

Plaintiff also continued to see Dr. Jacob, her neurologist, during the relevant period, the first visit being on August 5, 2002. Nerve conduction studies of the legs were read as normal but an EMG of the legs showed L4 radiculopathy on both sides and L5-S1 radiculopathy on the right. The same studies indicated cervical radiculopathy and carpal tunnel syndrome (tr. 520-521). Dr. Jacob saw plaintiff a few times in the summer of 2002 and she returned to him in late 2004 complaining of terrible headaches (tr. 514). A cervical MRI at that time was read as normal (tr. 513). As noted earlier, plaintiff was in a motor vehicle accident which exacerbated her neck problems (tr. 806). On January 12, 2005, Dr. Jacob performed a disability evaluation in which he noted neck pain secondary to degenerative disc disease, symptoms of carpal tunnel syndrome, lumbar disc disease with radicular symptoms and signs, status post laminectomy and disc excision at L3-4 and L4-5 and a history of fibromyalgia. He further noted that plaintiff did not have any motor deficit in the upper or lower extremities, had a normal gait, and had normal fine and gross motor movements in the upper and lower extremities. She was also noted to have paravertebral muscle spasm in the neck but no motor deficits or reflex deficits. There was some sensory impairment in the index finger on both sides as well as in the left leg in the L4-5 dermatome. She had normal gait, her grip strength and fine manipulations were normal, and she did not have any mental problems (tr. 791-794).

Plaintiff saw Dr. Rohan only once during the relevant period, on September 10, 2003. He felt that she had a left shoulder impingement and he suggested a steroid

injection but she declined, stating that she had reactions to such injections (tr. 477).

## DISCUSSION

The plaintiff argues that the ALJ erred in failing to pose a proper hypothetical question to the vocational expert, in failing properly to consider the opinions of the medical experts, and that plaintiff was disabled from her onset date as a matter of law. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

## DISCUSSION

1.  **Hypothetical question.**

Plaintiff first contends that the ALJ did not pose a proper hypothetical question to the vocational expert. A hypothetical question must comprehensively describe the plaintiff's condition, and vocational expert testimony that does not accurately address that condition cannot be considered substantial record evidence. *Pendley v. Heckler,* 767 F.2d 1561, 1563 (11th Cir. 1985). However, "the ALJ [is] not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Here plaintiff argues that the ALJ found that the plaintiff had the residual functional capacity to do less than was contained in the hypothetical, so that any opinion stated by the vocational expert was unsupported. Plaintiff points to the part of the ALJ's decision in which he found that plaintiff could lift less than 10 pounds frequently. This, plaintiff argues, disqualifies her from doing light work. The

**Commissioner's rules define "light work" in part:**

> **Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.**

20 C.F.R. § 404.1567(b). Thus, carrying up to 10 pounds frequently is a requirement for light work.

The ALJ did not actually ask a hypothetical question of the vocational expert. Rather, he asked the vocational expert to describe the plaintiff's past relevant work, which included both light and sedentary jobs. The only real question relating to residual functional capacity was :

> Q: Well obviously if a person were limited to a full range of light work, they could return to all these occupations.
>
> A: That's correct.

(Tr. 860). The ALJ then asked the vocational expert to give examples of both sedentary <u>and</u> light work jobs that were available with a sit/stand option. The expert listed four occupations: telemarketer, parking lot attendant, bench assembler, and companion. Of these, only the telemarketer position was sedentary, with 26,023 positions in Florida, and 295,575 in the United States, meaning that if plaintiff could not lift ten pounds frequently, as the ALJ held, she could not work at the other three positions. Together the other three positions totaled 14,899 positions in Florida and 365,418 in the United States. Moreover, the remaining position, telemarketer, is semi-skilled (tr. 861), but the ALJ found that "[t]he claimant has no transferrable skills from any past relevant work and/or transferability of skills is not an issue in

this case." (Tr. 37). Thus, plaintiff was not qualified to perform the duties of three of the four jobs cited by the ALJ because she could not lift ten pounds frequently, and she had no transferable skills that would allow here to work as a telemarketer. It may be that the ALJ's written decision simply contained a typographical error, and that he meant to say that plaintiff <u>could</u> lift ten pounds frequently, but it is not for this court to speculate on what might have been, much less to change any part of the ALJ's decision. This case should therefore be reversed and remanded for further consideration.

Plaintiff second ground for relief concerns the ALJ's treatment of the opinions of several physicians. However, the answer to the question of whether plaintiff could or could not lift ten pounds frequently will impact the ALJ's treatment of those physicians' opinions. Therefore, it is not necessary to review that part of plaintiff's appeal at this time.

This court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." Title 42 U.S.C. § 405(g). Remand is ordinarily appropriate for rehearing if the Commissioner failed to apply the law and regulations, or where the taking of additional evidence is necessary. When evidence has been fully developed and points unequivocally to a specific finding, the court may enter the finding that the Commissioner should have made. The court can reverse without remand where the Commissioner's decision is in plain disregard of the law and evidence. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *MacGregor, supra; Hale, supra*. Moreover, the failure to apply the correct legal standard is grounds for reversal, not remand. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1983).

Here the evidence does not point unequivocally to a finding of disabled, so remand is appropriate. Accordingly, Accordingly, it is respectfully RECOMMENDED

that the decision of the Commissioner be REVERSED, that the Commissioner be ordered to remand the case to the ALJ for further action consistent with this report and recommendation, that judgment be entered in favor of plaintiff pursuant to sentence four of 42 U.S.C. § 405 and that the clerk be directed to close the file.

At Pensacola, Florida this 14th day of May, 2008.

/s/ *Miles Davis*
**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  See 28 U.S.C. § 636;** *United States v. Roberts*, **858 F.2d 698, 701 (11th Cir. 1988).**

*Case No: 5:07cv122/RS/MD*